# EXHIBIT H

LEXSEE 2003 U.S. DIST. LEXIS 7040

MULTI-JUICE, S.A., SNAPPLE HELLAS, S.A., and NEW AGE BEVERAGES
HELLAS, Plaintiffs, - against - SNAPPLE BEVERAGE CORP., MISTIC BRANDS,
INC. and TRIARC COMPANIES, INC., Defendants.

02 Civ. 4635 (RPP)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2003 U.S. Dist. LEXIS 7040

April 24, 2003, Decided
April 25, 2003, Filed

**SUBSEQUENT HISTORY:** Reargument denied by, Motion denied by, Sanctions disallowed by *Multi-Juice, S.A. v. Snapple Bev. Corp., 2003 U.S. Dist. LEXIS 14406 (S.D.N.Y., Aug. 20, 2003)*

**DISPOSITION:** [*1] Defendants' motion to dismiss and motion to disqualify Plaintiffs' counsel were granted.

**COUNSEL:** For Plaintiffs: Louis F. Burke, Richard Lingg, Louis F. Burke, P.C., New York, NY.

For Defendants: Dennis P. Orr, Mayer, Brown, Rowe and Maw, New York, NY.

**JUDGES:** ROBERT P. PATTERSON, JR., U.S.D.J.

**OPINION BY:** ROBERT P. PATTERSON, JR.

**OPINION**

### OPINION AND ORDER

### ROBERT P. PATTERSON, JR., U.S.D.J.

Defendants Snapple Beverage Corp. ("Snapple"), Mistic Brands, Inc. ("Mistic") and Triarc Companies, Inc. ("Triarc") (collectively, "Defendants") move (1) to dismiss the second, fifth, seventh, eighth, ninth and tenth causes of action of the Complaint and, additionally, and in the alternative, move to dismiss all causes of action asserted against Defendant Triarc, pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*; and (2) to disqualify Louis F. Burke, counsel to Plaintiffs Multi Juice, S.A. ("Multi-Juice"), Snapple Hellas, S.A. ("Hellas"), and New Age Beverage Hellas ("New Age") (collectively, "Plaintiffs"), pursuant to DR 5-102 of the New York Rules of Professional Responsibility.

For the forgoing reasons, both Defendants' motion to dismiss and motion to disqualify Plaintiffs' counsel [*2] are granted.

### The Complaint

On June 14, 2002, Plaintiffs, by their attorney, Louis F. Burke and Ganfer & Shore, LLP, of counsel, brought a Complaint against Defendants containing ten causes of action. According to the Complaint, and by way of background, a previous lawsuit (the "Hellas Action") involved a wrongful termination and breach of a written exclusive import/distribution agreement between Hellas and Snapple, dated March 30, 1994 (the "Hellas Agreement"), pursuant to which Hellas was appointed the exclusive importer/distributor for Snapple beverages throughout Greece. (Complaint P 18.) Snapple is engaged in the business of producing and marketing iced teas, fruit drinks and assorted other such beverages, and until October 2000, was a wholly-owned subsidiary of Triarc. (Id. P 11.) Triarc is a holding company which, from mid-1997 to October 2000, owned Snapple and was likewise engaged in producing and marketing various brands of ice teas, fruit drinks, and other such beverages. (Id. P 13.) Triarc acquired Snapple from Quaker in mid-1997, and then sold Snapple, along with Snapple's Mistic subsidiary, to Cadbury Schweppes in October 2000. (Id. PP 12, 13) Hellas [*3] was organized under the corporate laws of Greece in 1995, and was engaged in the business of importing and distributing Snapple beverages throughout Greece from 1995 until 1997. (Id. P 8.) The principals of Hellas are Arthur and Naoum Tavantzis (collectively, the "Tavantzises"). (Id.) After Quaker's purchase of Snapple in 1996, the distribution of Snapple was assumed by a section of Quaker's sales force, and Quaker subsequently constructively terminated Snapple's

Case 7:07-cv-06775-SCR-GAY    Document 19-9    Filed 08/26/2008    Page 3 of 7

Page 2
2003 U.S. Dist. LEXIS 7040, *

distribution agreement with Hellas. (Id. P 22.) In August 1997, following the sale of Snapple to Triarc, the Hellas Action was settled by mutual agreement (the "Hellas Settlement Agreement"). (Id. P 23.) In the course of that settlement, Donna Bimbo, head of international sales at Triarc, Snapple and Mistic, caused the Tavantises to believe that companies owned by them would remain the exclusive importers and distributers of Snapple products in Greece. (Id.)

The Hellas Settlement Agreement provided in part (1) that Snapple pay $ 400,000 to Hellas and extend a future merchandise credit of $ 400,000 against the purchase of Snapple beverage products; and (2) that Hellas and Snapple "agree to negotiate in [*4] good faith towards entering into a 3-5 year written agreement under which Snapple would convey to Hellas, or a new corporation to be formed in Greece, the exclusive right during the term of the agreement to distribute Snapple beverages in Greece." (Id. P 26.)

In or about mid-1997, the Tavantzises moved to Greece and established Multi-Juice as a Greek corporation, hired personnel, leased a building, purchased equipment and merchandise, and began an advertising campaign. (Id. P 31.) Multi-Juice was established for the specific purpose of entering into an exclusive five year agreement pursuant to which Multi-Juice would become the exclusive importer and distributer of Snapple beverages throughout Greece. (Id. P 9.) Triarc/Snapple and Multi-Juice "operated as if a written exclusive agreement" for the distribution of Snapple product in Greece had been executed among them" (the "Multi-Juice Distribution Agreement"). (Id. P 28.) Despite exchanging several written drafts of the Multi-Juice Distribution Agreement, none was ever executed. (See id.) Multi-Juice worked to overcome the destroyed reputation of Snapple products that lingered from when Quaker controlled Snapple [*5] sales in Greece. (Id. PP 32-36.) Bimbo promised to immediately absorb Multi-Juice's expenses in having to replace outdated and stale Snapple products for Greek customers. (Id. P 36.) However, instead of issuing credit immediately, Triarc/Snapple carried the replacement merchandise orders on its books as a Multi-Juice debit for nearly one year, thereby reducing the credit available to Multi-Juice. (Id.) Furthermore, Triarc/Snapple failed to provide the documentation necessary to assist Multi-Juice in reclaiming coolers, needed to attract new customers, as had been promised by Bimbo in 1997. (Id. P 37.) Also, due to delays in deliveries of Snapple beverages promised by Triarc/Snapple, Multi-Juice was unable to properly re-launch Snapple products for the summer months in Greece. (Id. P 38.)

Contrary to Bimbo's express representations that Multi-Juice would not be subject to minimum order requirements, Bimbo notified Multi-Juice that (1) "orders for Snapple products could only be made on a quarterly basis, and would not be accepted on the basis of need"; (2) Triarc/Snapple needed six weeks advance notice to have products manufactured; (3) Triarc/Snapple did not have [*6] on-hand inventory available for delivery; and (4) Triarc and Snapple's ability to manufacture hinged on the third party bottling company, a fact of which Multi-Juice was not previously aware. (Id. P 40.) In 1998 and 1999, Bimbo continued to force Multi-Juice to purchase products that it did not need, and threatened to and did withhold those items that it had requested. (Id. PP 44-47.)

Among other things, Plaintiffs further alleged the following: Triarc/Snapple's rules governing ordering were arbitrarily applied to Multi-Juice, thereby causing severe financial damage (id. PP 48-51); Triarc/Snapple failed to support Multi-Juice's marketing efforts, as promised (id. PP 52-54); Triarc/Snapple failed to deliver the Snapple products that Multi-Juice ordered (id. PP 55-57); Triarc/Snapple sent inaccurate bills of lading to Multi-Juice, delaying sales and increasing expenses (id. P 58); Triarc/Snapple failed to work with Multi-Juice in the sale of Whipper Snapple beverages (id. PP 59-69); and Triarc/Snapple denied Multi-Juice any commission for introducing Snapple to the United States Navy. (Id. PP 70-71.)

In or about October 13, 1995, Mistic and New Age entered [*7] into an agreement ("New Age Distribution Agreement") whereby New Age was to become the exclusive distributor of Mistic products in Greece. (Id. P 72.) Mistic operated as a wholly-owned subsidiary of Snapple, and until October 2000 was a wholly-owned subsidiary of Triarc, and was, at all times relevant to this case, owned by Triarc. (Id. P 12.) Mistic engaged in the business of producing ice teas, fruit drinks, and other such beverages. (Id.) New Age was organized under the corporate laws of Greece in 1995, and was formed for the specific purpose of entering into an exclusive agreement with Mistic to become the exclusive distributor of Mistic beverages throughout Greece. (Id. P 10.) New Age's principals are the Tavantzises. (Id.) Triarc/Snapple caused Mistic to refrain from giving business to New Age, and instead Mistic sold its products to third party distributors for sale in Greece. (Id. P 73.) Mistic was a direct competitor of Snapple, though both companies were owned by Triarc. (Id. P 74.) Triarc/Snapple used proprietary intelligence and disclosed to Mistic that fruit punch and mango were Multi-Juice's two best selling Snapple flavors. (Id. PP 75-76.)

[*8] The Complaint contains the following specific causes of actions against Defendants [1]: (1) breach of the Multi-Juice Distribution Agreement; (2) constructive wrongful termination of the Multi-Juice Distribution Agreement; (3) fraud relating to Multi-Juice; (4) breach

Case 7:07-cv-06775-SCR-GAY    Document 19-9    Filed 08/26/2008    Page 4 of 7

Page 3
2003 U.S. Dist. LEXIS 7040, *

of the Hellas Settlement Agreement; (5) unjust enrichment; (6) breach of the New Age Distribution Agreement; (7) constructive wrongful termination of the New Age Distribution Agreement; (8) tortious interference as to New Age; (9) price discrimination under Greek competition law; and (10) tying under Greek competition law.

> 1   Causes of action 1-5 and 8-10 are against Snapple and Triarc only. Causes of action 6 and 7 are against Mistic only.

The Pending Motion

Defendants brought a motion on September 6, 2002 to dismiss certain causes of action listed in the Complaint, pursuant to *Fed. R. Civ. P. 12(b)(6)*, and a motion to disqualify Plaintiffs' counsel, Louis F. Burke, pursuant to DR 5-102 of the New York Rules of Professional Responsibility. [*9] Oral argument was held on February 19, 2003 at which time Plaintiffs stated that Triarc and Snapple entered into an oral distribution agreement (the Multi-Juice Distribution Agreement) in or around August 1997, confirming the allegation in paragraph two of the Complaint. (Transcript at 55; Compl. P 2.)

Discussion

I. Motion to Dismiss

Plaintiffs' claims may be dismissed pursuant to *Fed. R. Civ. P. 12(b)(6)* only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-6, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*. In accordance with Second Circuit law, all allegations in the Complaint are accepted as true, see *Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir. 1994)*, and all reasonable inferences are drawn in favor of Plaintiffs. See *Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995)*. Pursuant to *Erie R. Co. v. Tompkins, 304 U.S. 64, 82 L. Ed. 1188, 58 S. Ct. 817 (1938)*, "federal courts sitting in diversity apply state substantive law ..." *Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 416, 135 L. Ed. 2d 659, 116 S. Ct. 2211 (1996)*. [*10] See also, *Cantor Fitzgerald Inc. v. Lutnick, 313 F.3d 704, 710 (2d Cir. 2002)*.

A. Specific Causes of Action Are Dismissed as to Defendant Snapple

1. Second Cause of Action: Constructive Wrongful Termination of the Multi-Juice Distribution Agreement

A claim for constructive termination exists "when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." *Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 89 (2d Cir. 1996)*. Because no employment relationship between Snapple and Multi-Juice exists in this case, Plaintiff's constructive termination claim is invalid and consequently dismissed. 2

> 2   A claim for breach of an implied covenant of good faith and fair dealing is an implied condition of every contract. See e.g., *Travellers International, A.G. v. Trans World Airlines, Inc., 41 F.3d 1570, 1575 (2d Cir. 1994)*("Under New York law, the implied covenant of good faith and fair dealing inheres in every contract."); *Harris v. Provident Life and Accident Insurance Co., 310 F.3d 73, 78-81 (2d Cir. 2002)*(the district court was right to dismiss a claim for implied covenant of good faith and fair dealing under New York law on the grounds that it was duplicative with the claim for breach of contract). Accordingly, this Court disregards Plaintiffs' attempted substitution of the claim for breach of an implied covenant of good faith and fair dealing for the wrongful constructive termination claim because such a claim is already inherent in Plaintiffs' contract claim.

[*11] 2. Third Cause of Action: Fraud relating to Multi-Juice

Pursuant to New York law, "a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." *American Telephone & Telegraph Co. v. New York City Human Resources Admin., 833 F. Supp. 962, 984 (S.D.N.Y. 1993)* (quoting *Clark-Fitzpatrick, Inc. v. Long Island RR Co., 516 N.E.2d 190, 70 N.Y.2d 382, 389, 521 N.Y.S.2d 653 (N.Y. 1987))*. Pursuant to Second Circuit law, a fraud claim properly exists along side a contract claim when a plaintiff either: "(i) demonstrates[s] a legal duty separate from the duty to perform under the contract ... or (ii) demonstrate[s] a fraudulent misrepresentation collateral or extraneous to the contract ... or (iii) seek[s] special damages that are caused by the misrepresentation and unrecoverable as contract damages ..." *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc., 98 F.3d 13, 20 (2d Cir. 1996)*.

In this case, Plaintiffs have not alleged facts or presented argument which demonstrate that Defendants made a fraudulent misrepresentation that is separate from the [*12] alleged contract, nor have Plaintiffs alleged facts or presented argument showing that any of the alleged misrepresentations of Defendants were collateral to or extraneous to the contract. Lastly, Plaintiffs' out of

Case 7:07-cv-06775-SCR-GAY    Document 19-9    Filed 08/26/2008    Page 5 of 7

Page 4
2003 U.S. Dist. LEXIS 7040, *

pocket losses have not been shown to constitute special damages, unrecoverable as contract damages. Plaintiff's third cause of action is therefore dismissed.

### 3. Fifth Cause of Action: Unjust Enrichment

Under New York law, a claim for unjust enrichment may only be brought in the absence of an actual contract. *Apfel v. Prudential-Bache Securities, Inc., 616 N.E.2d 1095, 81 N.Y.S.2d 470, 478-79, 600 N.Y.S.2d 433 (N.Y. 1993)* (holding that an unjust enrichment claim was barred by the existence of an agreement between the parties). In this case, the allegations set forth in Multi-Juice's unjust enrichment claims (Compl. PP 107, 108) are similar in substance to those set forth in the contract claims. (Id. PP 81, 82, 86.) Due to the existence of an agreement between the parties, as admitted to by Plaintiffs (tr. at 55; Compl. P 2) and not disputed by Defendants (Defendants' Memorandum of Law in Support of their Motion to Dismiss at 12), the unjust enrichment [*13] claim is dismissed.

### 4. Eighth Cause of Action: Tortious Interference

A claim for tortious interference under New York law requires "the existence of a valid contract between plaintiff and a third-party, defendant's knowledge of the contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." *Lama Holding Co. v. Smith Barney Inc. et. al., 668 N.E.2d 1370, 88 N.Y.2d 413, 424, 646 N.Y.S.2d 76 (N.Y. 1996)*. Furthermore, a party "cannot tortiously interfere with its own contract." *Klein v. Jostens, Inc., 1985 U.S. Dist. LEXIS 18115, 1985 WL 1865, at *2 (S.D.N.Y. 1985)*. As Mistic was its wholly-owned subsidiary (compl. PP 12-13), Snapple could not tortiously interfere with the distribution agreement. See e.g., *Koret, Inc. v. Christian Dior, S.A., 161 A.D.2d 156, 157, 554 N.Y.S.2d 867 (N.Y. App. Div. 1990)* (finding that a corporate parent has the right to interfere with the contract of its subsidiary, in order to protect its economic interests); *MTI/The Image Group, Inc. v. Fox Studios East, Inc., 262 A.D.2d 20, 690 N.Y.S.2d 576, 579 (N.Y. App. Div. 1999)* [*14] (noting that it was an error not to dismiss a tortious interference claim where all named companies were either parent or sister companies). The tortious interference claim is dismissed.

### 5. Ninth and Tenth Causes of Action: Price Discrimination and Tying Under Greek Competition Law

Although a choice of law provision designating New York law as applicable to all disputes arising from the Multi-Juice Distribution Agreement existed in all written drafts exchanged between the parties, Plaintiffs brought alleged claims pursuant to the Treaty of Rome to which Greece is a signatory.

According to Article 86 of the Treaty of Rome, "any abuse by one or more undertakings of a dominant position in the common market or in a substantial part of it shall be prohibited as incompatible with the common market insofar as it may affect trade between Member States." Thus, a prerequisite for a claim pursuant to Article 86 of the Treaty of Rome is that the company alleged of a violation must hold a dominant position in the common market or a substantial part thereof. In this case, Plaintiffs assert that both Snapple and Mistic "enjoyed a dominant position within the Republic of Greece throughout the [*15] European common market in the market for Premium Alternative Beverages." (Compl. P 127.) Nonetheless, several other allegations in the Complaint contradict this general assertion and state that, at the time of the agreement, Snapple sales were minimal as a result of prior harm inflicted on the company's reputation by Quaker, specifically: "Multi-Juice had to reestablish the reputation of the Snapple product in Greece because Quaker had destroyed the reputation of the Snapple name among Greek vendors" (id. P 32); and "Multi-Juice had to work very hard to convince stores to put the Snapple brand back on the store shelves." (Id. P 36). In the face of these contrary allegations and the Complaint's failure to state what market share was held by either Snapple or Mistic, and Plaintiff's admission at oral argument that they do not have any studies to support an allegation of dominance (tr. at 51-52), a more specific allegation regarding market dominance is necessary to permit these claims to continue.

Lastly, with respect to the tying claim only, Article two of the Greek Civil Code defines tying as "subjecting the conclusion of a contract to the acceptance [*16] by the other party of additional supplies which either, by their nature or according to commercial usage, have no connection with the subject of such contract." In this case, the allegations regarding Snapple's forcing Multi-Juice to order Snapple products that had not been pre-tested in the Greek market as a prerequisite to ordering flavors which had been pre-tested, do not constitute tying. Different flavored beverages cannot be construed as having "no connection with the subject of the contract" and thus do not constitute a violation of Article two of the Greek Civil Code. Both the price discrimination and tying claims are dismissed

### B. Seventh Cause of Action Dismissed as to Defendant Mistic: Constructive Termination of the New Age Distribution Agreement

The discussion *supra* dismissing the second cause of action due to the lack of the existence of an employment relationship applies here in the context of constructive

Case 7:07-cv-06775-SCR-GAY   Document 19-9   Filed 08/26/2008   Page 6 of 7

Page 5
2003 U.S. Dist. LEXIS 7040, *

termination of the New Age Distribution Agreement. The claim of constructive termination of the New Age Distribution Agreement is dismissed on the same grounds.

### C. All Causes of Action Against Triarc Are Dismissed

Defendants move to dismiss all causes [*17] of action against Triarc on the grounds that Plaintiffs fail to properly make separate and distinct claims against Triarc upon which to support direct liability. Plaintiffs concede that Plaintiffs neither alleged facts supporting an agency theory, nor stated the elements of piercing the corporate veil in order to support a theory of *respondent superior* against Triarc as the holding company of Snapple. (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss at 18.) Nevertheless, Plaintiffs claim that Triarc is directly liable for Plaintiff's losses. (Id. at 18-19.)

The bare allegations naming Defendants as "Triarc/Snapple" are improper. All causes of actions against Triarc are dismissed on the basis that Plaintiffs failed to separately allege facts against Triarc showing that it is liable as an entity distinct from Snapple.

### II. Motion to Disqualify Counsel

Both DR 5-102(A) and (C) of the New York Rules of Professional Responsibility prohibit a lawyer, either at the beginning of an attorney/client relationship, or in the midst of one, from acting as an "advocate on issues of fact before a tribunal" if "it is obvious that the lawyer ought to [*18] be called as a witness on a significant issue on behalf of a client." Id. Under both provisions, the exceptions for when a lawyer may act as an advocate and also testify are the following:

> 1. If the testimony will relate solely to an uncontested issue.
>
> 2. If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.
>
> 3. If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or the lawyer's firm to the client.
>
> 4. As to any matter, if disqualification as an advocate would work a substantial hardship on the client because of the distinctive value of the lawyer as counsel in the particular case.

Id. A client may not waive this rule's protection "by promising not to call the attorney as a witness." *Munk v. Goldome Nat'l Corp.*, 697 F. Supp. 784, 787 (S.D.N.Y. 1988) (internal citation omitted). Nonetheless, motions to disqualify counsel "are generally looked upon with disfavor because oftimes they are tactically motivated, cause delay and add expense to the litigation." *World Food Systems, Inc. v. BID Holdings, Ltd.*, 2001 U.S. Dist. LEXIS 2449, 2001 WL 246372, at *3 (S.D.N.Y. 2001). [*19] Such disqualification motions "are subjected to strict scrutiny because of the 'strong potential for abuse' when a lawyer invokes the need to call opposing counsel as witness and then acts to disqualify him as counsel." *Forrest v. Par Pharmaceutical, Inc.*, 46 F. Supp.2d 244, 247 (S.D.N.Y. 1999)(internal citation omitted). New York state courts and courts in this jurisdiction have interpreted DR 5-102 to mean that counsel may only be disqualified "when it is likely that the testimony to be given by a witness is necessary." *S&S Hotel Ventures Ltd. Partnership v. S.H. Corp.*, 508 N.E.2d 647, 69 N.Y.2d 437, 445-46, 515 N.Y.S.2d 735 (N.Y. 1987); Norman Reitman Co., Inc. v. IRB-Brasil Resseguros S.A., 2001 U.S. Dist. LEXIS 16073, 2001 WL 1132015, at *3 (S.D.N.Y. 2001).

According to a court in this district, the relevant factors for determining necessity include "the significance of the matters, the weight of the testimony, and the availability of other evidence." *Paramount Communications, Inc. v. Donaghy*, 858 F. Supp. 391, 394 (S.D.N.Y. 1994). Plaintiffs in this case argue that there is no dispute as to the fact that the parties [*20] entered into the Hellas Settlement Agreement, and that additional testimony related to specific language or how the Hellas board of directors would have to approve the settlement is irrelevant. Plaintiffs maintain that the Tavantzises are best suited to testify as to those important points, and that their testimony, in addition to records of written communications, will be a sufficient substitute for attorney Burke's testimony. Defendants contend that Burke was more than a mere conduit for communication, and according to Donna Bimbo's Affidavit dated December 6, 2002, Burke was the sole representative for Plaintiffs at numerous meetings and conversations negotiating the terms of that Multi-Juice Distribution Agreement. (Bimbo Aff. P 10.) Essentially, Plaintiffs claim that Ms. Bimbo did not carry out her oral representations during the negotiations in good faith. (Compl. PP 23-25, 27, 34, 36-47, 51-52, 55-59, 70-71.) However, Plaintiffs do not contest Ms. Bimbo's assertion that Mr. Burke was often Plaintiffs' sole representative at the meetings, and do not claim that any of the stated exceptions within the New York Rules of Professional Responsibility apply here. Therefore, due to Burke's [*21] extensive involvement in the Hellas Settlement Agreement, Burke's testimony

will be necessary, and Burke is disqualified as Plaintiffs' counsel. See e.g., *Hoerger v. Board of Education*, 129 A.D.2d 659, 660, 514 N.Y.S.2d 402 (N.Y. App. Div. 1987) (held that the attorney who was chief negotiator for the defendant in an agreement, and also represented the defendant in an action involving the alleged breach of the very same agreement needed to be disqualified).

Conclusion

Accordingly, the second, fifth, eighth, ninth and tenth causes of action are dismissed against Snapple; the seventh cause of action is dismissed against Mistic; and all causes of action are dismissed against Triarc. Furthermore, Louis F. Burke is disqualified as Plaintiffs' counsel.

IT IS SO ORDERED.

Dated: April 24, 2003

Robert P. Patterson, Jr.

U.S.D.J.