# EXHIBIT F

LEXSEE 1998 U.S. DIST. LEXIS 12176

**JOSEPH P. FOLEY, Plaintiff, v. BETHLEHEM STEEL CORPORATION,
Defendant.**

**87-CV-1489A**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
NEW YORK**

*1998 U.S. Dist. LEXIS 12176*

**January 27, 1998, Decided
January 27, 1998, Filed**

**DISPOSITION:** [*1] Final judgment entered in favor of defendant.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employee filed an action against defendant employer, alleging that he was terminated in violation of § 510 of the Employee Retirement Income Security Act (ERISA), *29 U.S.C.S. § 1140.*

**OVERVIEW:** The former employee claimed that the employer fired him in order to prevent him from attaining a certain type of pension. The employer contended that the employee was fired because of his inability to effectively manage subordinate employees. In awarding judgment to the employer, the court found that the employee's claim was barred by the two-year statute of limitations. The employee's claim accrued on the date that he was terminated. Neither tolling principles nor the doctrine of equitable estoppel served to extend the amount of time in which the employee could bring suit. The court further found that the employee's § 510 claim failed on the merits. The employee produced little evidence tending to show that his discharge occurred under circumstances giving rise to an inference that the employer fired him to interfere with his pension rights. Even if the employee had established a prima facie case, he failed to show that the employer's proffered justification for firing him was pretextual. The employer presented ample evidence to support its claim that the employee was fired because he was unable to productively manage his subordinates.

**OUTCOME:** The court awarded judgment to the employer.

**LexisNexis(R) Headnotes**

*Governments > Legislation > Statutes of Limitations > General Overview*
*Labor & Employment Law > Discrimination > Retaliation > Statutory Application > Employee Retirement Income Security Act (ERISA)*
*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies > Causes of Action > Interference With Protected Rights*
[HN1] Under § 510 of the Employee Retirement Income Security Act (ERISA), it shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan. *29 U.S.C.S. § 1140.* Section 510 is enforceable through an action under § 502(a)(3). *29 U.S.C.S. § 1132(a)(3).* Congress did not provide a statute of limitations for enforcement actions under § 502(a)(3).

*Governments > Legislation > Statutes of Limitations > General Overview*
[HN2] Where Congress does not establish a statute of

1998 U.S. Dist. LEXIS 12176, *1

limitations in a federal statute, a court generally applies the statute of limitations period of the state law cause of action most analogous to the federal claim. In determining what law to apply, the court looks to the laws of the forum state.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN3] When a federal cause of action accrues is a question governed by federal law, even if the statute of limitations is borrowed from state law.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Governments > Legislation > Statutes of Limitations > Tolling*
[HN4] Where a court, in determining the statute of limitations for a federal cause of action, borrows a statute of limitations from an analogous state law cause of action, the court must also look to state law for principles of equitable tolling.

*Civil Procedure > Alternative Dispute Resolution > General Overview*
*Governments > Legislation > Statutes of Limitations > Tolling*
[HN5] A statute of limitations may be tolled under New York law when: (1) the commencement of an action has been stayed by court order or by statute, *N.Y. C.P.L.R. 204(a)* (1990); (2) a dispute that is ultimately determined to be nonarbitrable has been submitted to arbitration; (3) the defendant is outside New York when and after a claim accrues against him; and (4) the plaintiff is disabled by infancy or insanity when and after his claim accrues.

*Governments > Legislation > Statutes of Limitations > Equitable Estoppel*
[HN6] Under the doctrine of equitable estoppel, a court may estop a defendant's assertion of the statute of limitations on the basis of the defendant's misconduct in delaying the plaintiff from prosecuting a legitimate cause of action. This doctrine prevents the defendant from relying on a limitations defense when: (1) the defendant conceals from the plaintiff the fact that he has a cause of action, or (2) the plaintiff is aware of claim, but the defendant induces the plaintiff to forgo suit until period of limitations expires.

*Governments > Legislation > Statutes of Limitations > Equitable Estoppel*
[HN7] Equitable estoppel requires that the defendant affirmatively act to fraudulently conceal facts from the plaintiff.

*Labor & Employment Law > Collective Bargaining & Labor Relations > Discipline, Layoff & Termination*
*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies > Causes of Action > Interference With Protected Rights*
[HN8] Section 510 of the Employee Retirement Income Security Act (ERISA) makes unlawful the discharge of a participant or beneficiary of an employee benefit plan for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan. *29 U.S.C.S. § 1140*. A discharge is illegal under § 510 only where interference with pension rights is the motivating factor for, not merely a consequence of, the discharge. Thus, a plaintiff must show more than that he has been deprived of the opportunity to accrue additional benefits through more years of employment; he must offer evidence showing that the discharge was motivated at least in part by the employer's desire to interfere with his pension rights.

*Evidence > Procedural Considerations > Burdens of Proof > Ultimate Burden of Persuasion*
*Labor & Employment Law > Discrimination > Age Discrimination > Federal & State Interrelationships*
*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > General Overview*
[HN9] In a case under § 510 of the Employee Retirement Income Security Act (ERISA), the burdens of production and order of proof are allocated in the same manner as in Title VII and Age Discrimination in Employment Act (ADEA) claims, using the framework set out in McDonnell Douglas. Under the McDonnell Douglas framework, the plaintiff must initially prove by a preponderance of the evidence a prima facie case of discrimination. In order to prove a prima facie case of discrimination, a plaintiff must produce evidence of four facts: (1) that he belongs to a protected class; (2) that he was performing his duties satisfactorily; (3) that he was discharged; and (4) that his discharge occurred in circumstances giving rise to an inference of discrimination on the basis of his membership in that class. The plaintiff's burden at this stage is characterized

1998 U.S. Dist. LEXIS 12176, *1

as "minimal." Next, the burden shifts to the defendant to articulate a legitimate reason for the employment action. Once the defendant articulates a legitimate reason, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reason offered by the defendant is pretext for discrimination. The plaintiff at all times retains the ultimate burden of persuading the trier of fact that he has been the victim of intentional discrimination.

**COUNSEL:** For JOSEPH PETER FOLEY, plaintiff: Robert Villarini, Michalek, Villarini & Henry, Hamburg, NY.

For BETHLEHEM STEEL CORPORATION, defendant: Ginger D. Schroder, Buchanan Ingersoll P.C., Buffalo, NY.

**JUDGES:** Hon. Richard J. Arcara, United States District Judge.

**OPINION BY:** Richard J. Arcara

**OPINION**

**DECISION AND ORDER**

Hon. Richard J. Arcara

United States District Judge

**INTRODUCTION**

On November 30, 1987, plaintiff Joseph P. Foley commenced this action by filing a pro se complaint, naming as defendant L.D. Sampsell, a supervisor at Bethlehem Steel Corporation. Plaintiff later secured counsel and amended his complaint several times, and he presently names as defendant Bethlehem Steel Corporation ("Bethlehem"). Plaintiff claims that he was terminated by defendant Bethlehem in violation of the Employee Retirement Insurance Security Act ("ERISA") § 510, *29 U.S.C. § 1140.* In essence, plaintiff contends that Bethlehem fired him in order to prevent him from attaining a certain type of pension, while defendant contends that plaintiff was fired because of his inability to effectively manage subordinate employees.

Plaintiff Joseph P. Foley was born on January 23, 1928, and was employed by Bethlehem from November

12, 1956 to August 8, 1977. Plaintiff was a salaried, nonrepresented employee who, over the course of more than twenty years, [*2] held a variety of positions in the data processing department at Bethlehem. Defendant Bethlehem, incorporated under the laws of Delaware, ran steel manufacturing plants in the Buffalo area as well as in Pennsylvania at the time the events giving rise to this litigation occurred.

A nonjury trial was held before this Court on March 20 to 22 and March 25 to 27 of 1996. Each party called several witnesses and introduced numerous exhibits. After carefully considering the evidence adduced at trial and reviewing the submissions of the parties, the Court finds in favor of defendant Bethlehem Steel Corporation. The following constitutes the Court's findings of fact and conclusions of law pursuant to *Federal Rule of Civil Procedure 52(a).*

**FINDINGS OF FACT**

**I. 1956-1976: Background of Plaintiff's Career at Bethlehem**

In 1956, plaintiff began working for Bethlehem at its Lackawanna, New York plant. Plaintiff's Exhibit ("P. Ex.") 53A. In 1960, he was transferred to the Johnstown, Pennsylvania plant, where he held the position of Administrative Assistant in the Data Processing Department. In 1970, plaintiff was transferred to Bethlehem's home office in Bethlehem, Pennsylvania, [*3] where he assumed the position of Assistant Manager of Systems and Programming, a position that entailed supervisory responsibilities.

Although plaintiff was technically competent, he had a problematic management style. While plaintiff held the position of Assistant Manager, his supervisors first began to become concerned about his ability to manage other employees in an effective and professional manner. These concerns surfaced in an evaluation of plaintiff that was done during this time period. A system for evaluating employees at Bethlehem existed while plaintiff was employed there, under which employees were to be evaluated on an annual basis. This system of evaluations was called the "Performance Appraisal Program," and the evaluations themselves were known as "PAP's." Plaintiff's supervisor at this time, James E. Adams, conducted a PAP of plaintiff in 1971. P. Ex. 13. The PAP rated plaintiff "above average" but stated that plaintiff had to "improve his communications with subordinates.

1998 U.S. Dist. LEXIS 12176, *3

He must also develop a sound relationship with key personnel necessary for effective teamwork. He is sound technically. He must develop the managerial skills, planning, motivation, personnel problem [*4] [sic] and human relations." P.Ex. 13.

Seven months later in 1972, plaintiff's supervisors began to note more serious problems with plaintiff's management style. At this time, plaintiff's supervisor, Leonard Dimmick, placed a "Record of Interview" in his personnel file. P. Ex. 14. A "Record of Interview" was a form used as a disciplinary measure at Bethlehem when an employee presented problems of a serious nature. In the "Record of Interview" Dimmick noted "an increasing concern regarding your refusal to take orders." P. Ex. 14. Dimmick stated that plaintiff would be kept on at Bethlehem but "on our terms." P. Ex. 14. Plaintiff was instructed: "know and make no mistakes about your area of responsibility." P. Ex. 14. Dimmick further stated that:

> "I expect fair, impartial treatment of all your employees. The morale of your section is your responsibility. There is a big operation moving into Easton; I don't want to loose [sic] any employees because of your attitude, relationships. Build them up. Don't knock them down. Treat them as human beings. Don't belittle them in the presence of their peers."

P. Ex. 14. Dimmick went on to state, "I expect some attempt to change [*5] your attitude. It has got to be done, Pete, there's no other way." P. Ex. 14. As a result of this critical evaluation, plaintiff was placed on a six-month probation. Transcript ("Tr.") 567-68.

In December of 1973, plaintiff was transferred to the position of Special Assistant to the General Manager of Data Processing. Plaintiff characterized this transfer as a promotion. Tr. 474-76. Defendant, on the other hand, claimed that this transfer was intended to move plaintiff to a position where he would not have supervisory responsibilities. Tr. 578.

In June of 1975, plaintiff was transferred once more, with no pay increase, to the Lackawanna Plant. P. Ex. 40. Again, plaintiff testified that this move was a promotion. Tr. 115. However, defendant pointed out that the announcement that was sent out to employees characterized this move as a "transfer" and plaintiff's

official employment record does not denote the move as a promotion. Tr. 477; P. Ex. 53a.

## II. 1976-1977: Plaintiff as Manager of Data Processing

On January 1, 1976, plaintiff was promoted to the position of Manager of Data Processing at the Lackawanna Plant, despite his ambiguous record of performance. P. Ex. 44. [*6] While heading the Data Processing Department at Lackawanna, plaintiff reported to Winslow Hill, the Assistant General Manager of Corporate Data Processing. Hill, in turn, reported to Dimmick, the General Manager of Corporate Data Processing.

### A. Witness Testimony

At trial, each party offered the testimony of witnesses who were employed by Bethlehem at the Lackawanna plant while plaintiff was the Manager of Data Processing. These witnesses differed in their accounts of plaintiff's office demeanor and management style. At the outset, the Court notes that these witnesses were being called upon to recount events that happened in 1977, almost twenty years before this trial.

Plaintiff offered the testimony of Clifford A. Martin, who was employed at the Lackawanna plant for thirty years. Martin worked in the Data Processing Department. Plaintiff was Martin's ultimate, although not direct, supervisor. Martin described plaintiff's conduct in the office as "very professional" and testified that he had never seen plaintiff in a "fit of rage." Tr. 56.

Similar testimony was given by Warren Sawicki, who also worked in the Data Processing Department while plaintiff was its manager. Sawicki [*7] testified that plaintiff "was a very nice person. He never raised his voice." Tr. 493. Sawicki further testified that he had observed plaintiff's interactions with his direct subordinates, the chiefs of the various sub-departments within the Data Processing Department. Sawicki stated that with respect to these chiefs, plaintiff "was always well-behaved. He very seldom raised his voice, if he raised his voice. At times, we all had to be stern . . . but he wouldn't lose his cool, so to speak." Tr. 493.

Plaintiff also offered the testimony of Virginia Parker, who was employed as a computer operator in the Data Processing Department while plaintiff was its

1998 U.S. Dist. LEXIS 12176, *7

manager. Parker was a union steward, a position which entailed assisting other employees present grievances to management. Parker worked the night shift and consequently did not see plaintiff on a daily basis. However, as a union steward, she would occasionally interact with plaintiff when she assisted other employees with their grievances. Parker testified that in her experience as a union steward, no one ever filed a grievance against plaintiff for his conduct. Tr. 532. Moreover, she testified that he handled grievances fairly. Tr. [*8] 532.

Another witness who testified on behalf of the plaintiff was Jack Vanderwerf, also a former Bethlehem employee. Vanderwerf worked in the Data Processing Department, and although plaintiff was his ultimate supervisor, there were several levels of supervision between Vanderwerf and plaintiff. Vanderwerf testified that plaintiff treated people with respect and that he never saw him yell at other employees or act inappropriately toward them. Tr. 548-50.

In contrast, defendant's witnesses painted a less pleasant picture of working under plaintiff. For example, Nora May, who was plaintiff's administrative assistant while he held the position of manager of data processing, testified that she heard plaintiff raise his voice and use profanity during staff meetings. Tr. 809-10. May also testified that plaintiff did not treat members of his staff professionally. Tr. 853.

Another witness for defendant was William J. Kuebler. Kuebler was chief of computer operations and reported directly to plaintiff while plaintiff was manager of data processing. Kuebler testified that during staff meetings, plaintiff would raise his voice, and "his face would get red. He would be very belligerent." Tr. [*9] 868. Kuebler further recounted a meeting at which Bethlehem employees met with representatives from IBM. At this meeting, according to Kuebler, plaintiff began yelling at Kuebler about a problem with his work. Kuebler testified that plaintiff "must have carried on for twenty to twenty-five minutes and did nothing but rip me up and down. And I thought this was very embarrassing, because not only was Bethlehem people there, but IBM." Tr. 882.

Defendant also offered the testimony of Paul A. Durni. Durni, who worked in the data processing department at the Lackawanna plant, was Kuebler's assistant. Durni testified that about eight or nine months after plaintiff became manager of the data processing department, he asked to be transferred from his position as Kuebler's assistant to his former position as floor supervisor. Tr. 934-35. Durni stated that he requested this demotion to "move myself out of the line of fire." Tr. 936. Durni further testified about his decision to retire later that year. He stated that working with plaintiff was a factor contributing to his decision to retire. Tr. 941. However, Durni's testimony was ambiguous on this point; he also stated that he retired because [*10] he had been asked to work night shifts. Tr. 941-43.

Clearly, plaintiff's witnesses and defendant's witnesses gave contradictory testimony about plaintiff's management style and professionalism. The Court notes that the defendant's witnesses, who generally testified that working under plaintiff was an unpleasant experience, were persons who were supervised more directly by plaintiff than plaintiff's witnesses were. The fact that defendant's witnesses had more day-to-day contact with plaintiff, coupled with the fact that the documentary evidence discussed below tends to support their accounts, causes the Court to accord greater weight to the testimony of defendant's witnesses than those of plaintiff.

### B. Documentary Evidence -- Trip Reports

In addition to the above testimony, documentary evidence was presented to the Court. While plaintiff held the position of Manager of Data Processing, Hill, at times accompanied by Dimmick, made periodic trips to Lackawanna to check on the data processing operations at that plant. Generally, after making a trip to Lackawanna, Hill would generate a "trip report" in which he would summarize the results of his trips for Dimmick. Plaintiff [*11] was given copies or drafts of the reports for his information. Several of these trip reports reveal that throughout plaintiff's tenure as Manager of Data Processing, plaintiff's supervisors were concerned with his ability to amicably and productively manager his staff.

The first trip report, relating to a trip Hill took to the Lackawanna plant on February 23 to 25, 1976, shows that early on in plaintiff's tenure as manager his managerial style troubled his superiors. P. Ex. 1. In the report, Hill noted that one of plaintiff's subordinates, a chief of one of the Data Processing units, Ron Dehlinger, "currently does not enjoy his work because of the constant criticism and he is not included in much." P. Ex. 1. Another chief,

1998 U.S. Dist. LEXIS 12176, *11

Steve Peters, was reported as stating that "he doesn't know exactly what Pete [1] wants." P. Ex. 1. More complaints about plaintiff's management style were registered by William G. Kuebler, another of plaintiff's subordinates, who "stated that he is disgusted because he cannot seem to do anything right for Pete." P. Ex. 1. However, the report goes on to note that Kuebler "seemed to recognize Pete's motives and agreed that he has been subconsciously resisting Pete." [*12] P. Ex. 1. Hill concluded the report by stating that, "I reviewed some of my concerns with Pete and told him to stop bringing up the past and give positive direction. Pete needs to compliment his people more. . . Lackawanna needs to be followed up more often than quarterly." P. Ex. 1.

1 "Pete" refers to plaintiff.

The next trip report concerns a visit Hill and Dimmick made to the Lackawanna plant on March 30 and 31, 1976. P. Ex. 2. This trip report contained more criticism of plaintiff's management style, stating that "we must settle down or people will be leaving." P. Ex. 2. The report notes that Dimmick told plaintiff "that he should be sure he discusses problems with his employees and don't just write them off." P. Ex. 2. Plaintiff, the report stated, "must build confidence." P. Ex. 2.

A trip report relating to a trip Hill made on July 20, 1976 contained sharp criticism of plaintiff and indicated that plaintiff's supervisors were extremely concerned with plaintiff's managerial performance. P. Ex. 3. In the [*13] report, Hill listed for Dimmick the following problems which Hill had discussed with plaintiff during the trip:

1. Pete blames people for all happenings and keeps bringing them up.

2. He seems to only break down and not build up.

3. Tells F. A. Daggett [the Lackawanna plant manager] of all concerns and does not seem to level with us.

4. Pete does not take responsibility for any failures of his department. (in our opinion Pete is the one failing.)

5. Removing W. G. Kuebler will not eliminate the problem. We wonder who will be next.

6. Same situation as we had at the Home Office when he worked for Adams. We are afraid of a mass exit (3-5 key people).

7. Bottom line of this direction is fire Pete and we don't think that is the best interest. We want to improve him.

8. Our judgment is the situation is unsatisfactory.

9. Not clear in instructions to employees.

10. Goes around Chiefs, performs investigations, and issues directives to their subordinates.

11. Easiest action is to fire or place on shelf (happening too much with Pete). Inherited force must make them the best.

12. Failure on Manager part when it is necessary to fire or demote.

13. Investigate what you are [*14] not doing.

14. Many problems - multi-solutions - need to concentrate on an item and make a clear recommendation (appears to be shooting from hips) Keeps us off balance.

P. Ex. 3. The report also noted that plaintiff did not agree with Hill's assessment of these problems, but that he agreed to work toward their elimination. P. Ex. 3. Plaintiff reacted to Hill's July 20 trip report by writing a memorandum to Mr. Dimmick in which he contested Hill's criticisms. P. Ex. 4. In this memorandum, plaintiff went through each of Hill's points about plaintiff's management problems and in most cases denied that a problem existed or disputed the seriousness of the problem. P. Ex. 4. At trial, plaintiff denied that he had even discussed most of these issues with Hill during the trip. Tr. 207, 212.

The next trip report relates to Hill's visit to the Lackawanna plant on September 22 and 23, 1976. P. Ex.

1998 U.S. Dist. LEXIS 12176, *14

5. This report is not nearly as critical as the previous one, although in it Hill noted that "Pete agreed to take a more positive direction when he is counseling his supervisors. This includes issuing positive instructions to correct a problem." P. Ex. 5.

Likewise, the next trip report, summarizing [*15] a visit Hill and Dimmick made to Lackawanna on October 20, 1976, does not discuss plaintiff's management ability extensively, although it does note concern with morale among data processing employees at Lackawanna. P. Ex. 6. The report states that "the continual shifting of employees must cease. Pete must show positive, stable leadership so that the productivity can improve." P. Ex. 6.

A break from the general pattern of criticism of plaintiff's management style is apparent in the next trip report. P. Ex. 7. This report, relating the events of Hill's trip to Lackawanna on November 22 and 23, 1976, is devoid of negative commentary about plaintiff, and it concludes that "J.P.Foley appears to be on a positive track and is properly delegating the authority to his staff." P. Ex. 7.

However the next trip report, concerning Hill's trip to Lackawanna on January 20 and 21, 1977, again manifests concerns about plaintiff's management style. P. Ex. 8. Hill noted in the report that his concerns about the Lackawanna plant were tied to plaintiff's leadership. P. Ex. 8. With respect to Ron Dehlinger, one of plaintiff's subordinates, Hill stated that "Pete was careful to tell me of Ron's failings [*16] but not of his accomplishments. This has caused me to not trust Pete. I told Pete that I requested that Ron be transferred and restored to his previous earnings . . . A grave injustice has occurred in Pete's and my handling of Ron." P. Ex. 8.

### III. 1977: Plaintiff's Termination

While the trip reports show that concerns with plaintiff's treatment of his subordinates existed throughout his tenure as Manager of Data Processing, plaintiff was not fired until an incident occurred that was apparently the straw that broke the camel's back, involving his administrative assistant, Nora May. May, who testified at trial, worked at Bethlehem's Lackawanna plant for many years, as did her husband. She held her position as administrative assistant prior to plaintiff's appointment as Manager of Data Processing, working for plaintiff's predecessor, Herb McCaughey. May and her husband maintained a friendship outside of work with Mr. McCaughey and his wife, Mae McCaughey.

Mr. McCaughey was transferred to Bethlehem's Johnstown, Pennsylvania plant after plaintiff became Manager of Data Processing. In late July of 1977, the Johnstown plant experienced a severe flood. Ms. McCaughey, who had [*17] remained in the Buffalo area, called May and expressed concern for her husband's safety. May testified that Ms. McCaughey called her personally, that it was not a call for plaintiff, and thus she did not inform plaintiff of the call. Tr. 802. Instead May attempted to locate Mr. McCaughey by calling the home office for information on Mr. McCaughey's whereabouts.

Later, Hill called plaintiff from the home office and told him that he should congratulate May on her handling of the emergency phone call. Plaintiff admitted that he was upset by the fact that May did not inform him of Ms. McCaughey's call. Tr. 259, 651. The subsequent course of events is a subject of dispute between the parties.

Plaintiff testified that he called May into his office the next morning and with the door left open and in the presence of his assistant, Dr. Helmut Kranenburg, congratulated her on her handling of the call. Tr. 257-59. Plaintiff further testified that he calmly told May that he felt that she should have notified him of the phone call. Tr. 258-59, 652. Later that day, according to plaintiff, May came into plaintiff's office and asked to be transferred. Tr. 261-62, 653.

In contrast, May testified [*18] that when plaintiff called her into his office, no one else was present, and plaintiff shut the door. Tr. 806. Plaintiff, according to May's testimony, was "irate" and "ranting and raging." Tr. 804-805. May testified that plaintiff accused her of disloyalty because she had not informed him of the phone call and threatened to fire her. Tr. 805. May testified that she requested a transfer instead of termination, and plaintiff agreed. Tr. 807-08. May further testified that Hill called her at home the next day, which was a Saturday, and that Dimmick called her on Sunday. They assured her that she would not be transferred or fired.

The Court finds that May's testimony concerning these events was more credible than plaintiff's testimony. In contrast to plaintiff, May appeared to be a disinterested witness. May did not appear spiteful toward plaintiff despite the above described incident. Furthermore, plaintiff's version of the events lacks credibility because it is hard to believe that if plaintiff remained as calm as

1998 U.S. Dist. LEXIS 12176, *18

he suggests, May would have asked to be transferred.

On the following Monday, July 25, 1977, Hill called plaintiff to discuss the incident and told plaintiff that he and [*19] Dimmick would be in Lackawanna in two weeks. Plaintiff was on vacation the next week, the week of August 1.

On August 3, Dimmick wrote a letter to the Vice President of Accounting stating that Foley should be terminated. P. Ex. 32. In the letter, Dimmick emphasized that plaintiff had a history of problems with managing subordinates and pointed out that communication between plaintiff and his staff was highly problematic. P. Ex. 32. The letter went on to state that ten employees were "lost" by the Data Processing Department because of plaintiff's management style. P. Ex. 32.

When plaintiff returned from vacation on Monday, August 8, Dimmick and Hill met with him in his office. They showed him the letter Dimmick had written concerning plaintiff's imminent termination, and they offered him the option of resignation or termination. Plaintiff refused to resign and was fired.

The Court notes that plaintiff presented evidence that on June 1, 1977, approximately two months before he was fired, he received a 5.8 percent merit increase in his salary. P. Ex. 29. Plaintiff indicated that the fact that his termination was preceded by a merit increase manifests wrongdoing in his termination. [*20] Defendant, on the other hand, claims that the merit increase was intended to adjust plaintiff's salary for a cost of living increase. Defendant presented testimony that plaintiff had asked for a pay increase six months before he received the June 1977 increase to compensate him for a loss of $ 1200 in annual income due to the different tax structures in Pennsylvania (where he had previously been employed by Bethlehem) and New York. P. Ex. 46.

Plaintiff also presented evidence that about the time he was fired, Dimmick asked May for a list she kept that recorded each employee's name, his or her date of birth, and the number of years the employee had worked at Bethlehem. Plaintiff offered this evidence as proof that Dimmick intended to interfere with plaintiff's rights to a pension when firing him. However, May testified that Dimmick had requested a copy of this list on other occasions and that it was not unusual for him to do so. Tr. 845.

## IV. The "Rule of 65 Pension"

### A. Background of Pension System at Bethlehem

2

    2   The parties stipulated to many facts regarding the pension system at Bethlehem. The parties entered into two sets of stipulations, which are referenced to herein by docket item number.

[*21] Defendant offered a number of different retirement benefit options to employees, receipt of which depended upon factors such as years of service, age, and circumstances of separation. D. Ex. 7. Plaintiff is currently receiving a Deferred Vested pension benefit. Tr. 453. At issue is plaintiff's eligibility for the "Rule of 65 Pension" offered by defendant to certain employees.

Defendant's benefit plan provided for various types of retirement prior to normal retirement age that were available under certain circumstances. Item No. 77 P 11. The Rule of 65 Pension was one such type of retirement plan. Item No. 77 P 11. The Rule of 65 Pension was a benefit negotiated between the United Steelworkers of America ("USWA") and nine steel companies, one of which was defendant, in 1977. Item No. 77 P 14. On April 6, 1977, defendant signed a collective bargaining agreement, with an effective date of August 1, 1977, that included the Rule of 65 Pension. Item No. 77 P 15. Under the collective bargaining agreement, defendant was contractually bound to offer the Rule of 65 Pension to any bargaining unit employee meeting its eligibility requirements. Item No. 77 P 16.

As a practice, defendant had [*22] always provided the same or better fringe benefits to its salaried nonrepresented employees as it did to its represented employees. Item No. 77 P 17. Defendant thus incorporated the Rule of 65 Pension into its pension plan for salaried nonrepresented employees. Item No. 77 P 18.

The Rule of 65 Pension was a contingent benefit, as it provided a pension only to an employee: (1) who was under age 55 at the time service broke; (2) who had at least 20 years of continuous service; (3) whose age and years of continuous service total at least 65 but less than 80; (4) whose service was broken by permanent shutdown or layoff; and (5) who was not offered suitable long-term employment within the company during the

1998 U.S. Dist. LEXIS 12176, *22

two year period of layoff. Item No. 77 P 35.

### B. 1977 Layoffs and Ensuing Arbitration

During the years prior to plaintiff's termination, defendant Bethlehem experienced grave financial difficulties. Ten days after plaintiff was terminated, on August 18, 1977, defendant decided to close down certain of its steelmaking facilities. Item No. 96 P 74. As a result of this decision, during the next several months, a partial shutdown occurred at the Lackawanna plant, leading to the [*23] lay-off of more than twenty percent of the work force. Item No. 77 P 42. When employees were laid off in the fall of 1977 from the Bethlehem plant, they were given the option of selecting either a severance allowance or a lay-off pension. Item No. 77 P 43.

According to the terms of the collective bargaining agreement, an employee had to be actively at work on or after January 1, 1978, to be eligible for a Rule of 65 Pension. Item No. 77 P 24. However, it had been the defendant's past practice with respect to pensions to allow employees who were laid off to accrue two additional years of service to receive benefits if they were otherwise eligible. Item No. 77 P 27. This practice was referred to as "creeping." Defendant determined that with respect to the Rule of 65 Pension, "creeping" would not be permitted. Thus, the Rule of 65 Pension would not be available to the employees laid off in the fall of 1977, even if they were otherwise eligible. The USWA objected to this decision and submitted the issue to arbitration in February of 1978. Item No. 77 P 26.

On April 5, 1978, the arbitrators decided in favor of the union. Item No. 77 P 28. As a result, defendant contacted employees who [*24] had been laid off in late 1977 and allowed them to elect the Rule of 65 Pension if they were otherwise eligible. Item No. 77 P 29. Following its past practice, defendant also decided to offer the same option to salaried, nonrepresented employees laid off in late 1977. Item No. 77 P 30. Between 1978 and March of 1995 defendant granted Rule of 65 Pensions to 3,404 persons. Item No. 77 P 61.

Plaintiff was not offered this option by defendant since he had been terminated rather than laid off. It is from this series of events that plaintiff claims he was terminated in violation of ERISA. Plaintiff claims that defendant terminated him in August of 1977 so that he would not be laid off later that fall with other employees. Plaintiff claims that defendant took this action to interfere with his ability to elect the layoff option, because after the arbitrator's decision and its extension to nonrepresented employees, he would have been entitled to a Rule of 65 Pension. Tr. 630-37.

### CONCLUSIONS OF LAW

### I. Statute of Limitations

#### A. Applicable Statute of Limitations

[HN1] Under Section 510 of ERISA,

it shall be unlawful for any person to discharge, fine, suspend, expel, discipline, [*25] or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan.

29 U.S.C. § 1140. Section 510 is enforceable through an action under Section 502(a)(3). 29 U.S.C. § 1132(a)(3). Congress did not provide a statute of limitations for enforcement actions under Section 502(a)(3).

[HN2] Where Congress does not establish a statute of limitations in a federal statute, a court generally applies the statute of limitations period of the state law cause of action most analogous to the federal claim. North Star Steel Co. v. Thomas, 515 U.S. 29, 33-34, 132 L. Ed. 2d 27, 115 S. Ct. 1927 (1995); Sandberg v. KPMG Peat Marwick, L.L.P., 111 F.3d 331, 333 (2d Cir. 1997). In determining what law to apply, the court looks to the laws of the forum state. Thus in this case New York law applies. Sandberg, 111 F.3d at 333.

In Sandberg v. KPMG Peat Marwick, L.L.P., the Second Circuit held that the cause of action most analogous to an action to enforce Section 510 is an [*26] action under New York's workers' compensation statute that makes it unlawful to discharge an employee who has made a claim for workers' compensation benefits. 111 F.3d at 335. Actions under that statute are subject to a two-year statute of limitations. N.Y. Work. Comp. Law § 120. The Second Circuit held that this two year statute of limitations governs actions brought under Section 510 of ERISA. Sandberg, 111 F.3d at 335.

1998 U.S. Dist. LEXIS 12176, *26

Plaintiff was terminated on August 8, 1977 and filed suit on November 30, 1987, more than ten years later. Thus, it would appear that plaintiff's claim is barred by the statute of limitations. Plaintiff, however, has emphasized that he did not receive a summary plan description containing information about the Rule of 65 pension until November of 1986. [3] Plaintiff has failed to articulate, either in briefs submitted to the Court or during trial, any legal theory under which he contends that this fact affects the statute of limitations. However, plaintiff's arguments imply either that: (1) plaintiff's cause of action did not accrue until he received the summary plan description; or, (2) the statute of limitations should be equitably tolled or the defendant should [*27] be equitably estopped from asserting the limitations defense.

> 3  Defendant denies this contention and presented evidence suggesting that plaintiff likely received a summary plan description with information about the Rule of 65 Pension much earlier than plaintiff claims. As the Court finds that plaintiff's claim is barred by the statute of limitations even if he did not receive information about the Rule of 65 Pension until 1986, the Court finds it unnecessary to resolve this factual dispute.

### B. Accrual

[HN3] When a federal cause of action accrues is a question governed by federal law, even if the statute of limitations is borrowed from state law. See 19 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 4519, at 622 (2d ed. 1996). Neither the Supreme Court nor the Second Circuit has addressed the question of when a claim under Section 510 accrues. However, the Seventh Circuit has examined this issue in two cases, Tolle v. Carroll Touch, Inc., 977 F.2d 1129 (7th Cir. 1992) and Teumer [*28] v. General Motors Corp., 34 F.3d 542 (7th Cir. 1994). In the Tolle case, the court determined that the time of accrual of a Section 510 claim turns on the illegal action that is the essence of a Section 510 claim -- the termination (or other employment action) that unlawfully interferes with the attainment of benefits. 977 F.2d at 1140. The court held that the cause of action therefore accrues when the employer makes the decision to terminate the plaintiff and communicates that decision to the plaintiff. Id. at 1141.

Similarly, in Teumer, the court held that "Teumer's § 510 claim challenging the legality of his layoff accrued in 1986 when the layoff occurred and he found out about it." 34 F.3d at 550. Significantly for the present case, the court rejected the plaintiff's argument that the cause of action did not accrue until "he first discovered the information from which he ascertained the alleged unlawful nature of the layoff." Id. The court noted that when the plaintiff gained knowledge of the illegality was irrelevant to the issue of accrual, although it might affect the issue of tolling. Id.

The Tenth Circuit has also addressed the issue of when a Section [*29] 510 claim accrues. In Held v. Manufacturers Hanover Leasing Corp., the court primarily focused on whether a plaintiff needs to exhaust administrative remedies prior to bringing a Section 510 action. 912 F.2d 1197, 1203-05 (10th Cir. 1990). After determining that no exhaustion requirement existed, the court concluded that the plaintiff's cause of action arose when the defendant discharged the plaintiff, allegedly for the purpose of interfering with the attainment of benefits. Id. at 1205.

The Court agrees with the reasoning and conclusions of these cases. Plaintiff argues that he did not receive a summary plan description containing information about the Rule of 65 pension until November of 1986, and that therefore his claim did not accrue until that date. However, as in Teumer, whether plaintiff had all the information regarding the purported illegality of his termination is irrelevant to the issue of accrual. The essence of plaintiff's claim is that he was injured by the termination, so the date of termination is the accrual date of plaintiff's claim. The Court thus concludes that plaintiff's cause of action under Section 510 of ERISA accrued on the date that he was terminated, [*30] August 8, 1977.

### C. Tolling and Estoppel

Plaintiff's claims regarding his ignorance of the existence of the Rule of 65 pension can also be construed as an argument that the statute of limitations should be tolled. [HN4] Where a court, in determining the statute of limitations for a federal cause of action, borrows a statute of limitations from an analogous state law cause of action, the court must also look to state law for principles of equitable tolling. See Leon v. Murphy, 988 F.2d 303 (2d Cir. 1993) (applying New York tolling principles to § 1983 action where statute of limitations was borrowed from New York law); WRIGHT, supra at § 4519, at 622-635. In Leon v. Murphy, a Section 1983 case, the

1998 U.S. Dist. LEXIS 12176, *30

Second Circuit noted that New York has codified its tolling principles. *988 F.2d at 310.* [HN5] A statute of limitations may be tolled under New York law when:

> (1) the commencement of an action has been stayed by court order or by statute, *N.Y. Civ. Prac. L. & R. § 204(a)* (McKinney 19990); (2) a dispute that is ultimately determined to be nonarbitrable has been submitted to arbitration, *id. § 204(b)*; (3) the defendant is outside New York when and after a claim accrues [*31] against him, *id. § 207*; and (4) the plaintiff is disabled by infancy or insanity when and after his claim accrues. *Id. § 208.*

*Leon, 988 F.2d at 310.* Clearly, this case does not present any of these situations so the statute of limitations cannot be tolled.

In addition to affording plaintiffs relief from a limitations defense under its codified tolling principles, New York law also provides relief from a limitations defense under the doctrine of equitable estoppel. [HN6] Under this doctrine, "a court may also estop a defendant's assertion of the statute of limitations on the basis of the defendant's misconduct in delaying the plaintiff from prosecuting a legitimate cause of action." *Id.* This doctrine prevents the defendant from relying on a limitations defense when: "(1) defendant conceals from plaintiff the fact that he has a cause of action, or (2) plaintiff is aware of claim, but defendant induces plaintiff to forgo suit until period of limitations expires." *Id.* (citing *N.Y.Civ. Prac. L. & R. § 201* cmt. 6).

The Court finds that defendant is not equitably estopped from raising the statute of limitations defense. Plaintiff has not presented any evidence that [*32] shows that defendant induced plaintiff to forgo filing suit until the limitations period was expired. However, plaintiff's arguments regarding defendant's failure to send him a summary plan description could arguably be interpreted as an argument that defendant was attempting to conceal from plaintiff that he had a cause of action, which would mean that the first theory of estoppel described above would apply.

The Court finds, however, that the facts as presented by plaintiff do not support the application of estoppel because of concealment by the defendant. [HN7]

Estoppel under this theory requires that the defendant affirmatively act to fraudulently conceal facts from the plaintiff. See *Chesrow v. Galiani, 234 A.D.2d 9, 650 N.Y.S.2d 158, 160 (Ap. Div. 1996)* (noting that estoppel applies only where defendant's conduct surpasses mere negligence and amounts to "purposeful concealment and misrepresentation"); 75 N.Y. JUR. 2D LIMITATIONS AND LACHES § 33 (1989). Plaintiff did not present any evidence from which the Court could infer that defendant affirmatively concealed facts from plaintiff.

In sum, neither tolling principles nor the doctrine of equitable estoppel serves to extend the [*33] amount of time in which plaintiff could bring suit. Since plaintiff's claim accrued when he was terminated on August 8, 1977, and a two year statute of limitations applies, the Court finds that plaintiff's claim was barred by the statute of limitations as of August 8, 1979. Since plaintiff did not file suit until November 30, 1987, his suit is time-barred.

## II. Merits of Plaintiff's Section 510 Claim

Although the Court could rely solely on the statute of limitations in finding in favor of defendant, the Court also holds that plaintiff's Section 510 claim fails on its merits.

[HN8] Section 510 makes unlawful the discharge of "a participant or beneficiary [of an employee benefit plan] . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." *29 U.S.C. § 1140.* The Second Circuit has emphasized that a discharge is illegal under Section 510 only where interference with pension rights is the motivating factor for -- not merely a consequence of -- the discharge. *Lightfoot v. Union Carbide Corp., 110 F.3d 898, 906 (2d Cir. 1997).* Thus, a plaintiff must show more than that he "has been deprived of the [*34] opportunity to accrue additional benefits through more years of employment," *id.;* he must offer evidence showing that the discharge was motivated at least in part by the employer's desire to interfere with his pension rights. *Id.; see also Dister v. Continental Group, Inc., 859 F.2d 1108, 1111 (2d Cir. 1988).*

[HN9] In a Section 510 case, the burdens of production and order of proof are allocated in the same manner as in Title VII and Age Discrimination in Employment Act [ADEA] claims, using the framework set out in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).*

1998 U.S. Dist. LEXIS 12176, *34

*Dister, 859 F.2d at 1112*; see also *Chambers, 43 F.3d 29, 37*. Under the McDonnell Douglas framework, the plaintiff must initially prove by a preponderance of the evidence a prima facie case of discrimination. In order to prove a prima facie case of discrimination, a plaintiff must produce evidence of four facts: "(1) that he belongs to a protected class; (2) that he was performing his duties satisfactorily; (3) that he was discharged; and (4) that his discharge occurred in circumstances giving rise to an inference of discrimination on the basis of his membership [*35] in that class." *Chambers, 43 F.2d at 37*; see also *Gitlitz v. Compagnie Nationale Air France, 129 F.3d 554, 559 (11th Cir. 1997)* (phrasing essentially the same test slightly differently in the context of an ERISA case; the plaintiff must prove "(1) that he is entitled to ERISA's protection, (2) was qualified for the position, and (3) was discharged under circumstances that give rise to an inference of discrimination.") The plaintiff's burden at this stage has been characterized as "minimal." *Fisher, 114 F.3d 1332, 1337.*

Next, the burden shifts to the defendant to articulate a legitimate reason for the employment action. Once the defendant articulates a legitimate reason, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reason offered by the defendant is pretext for discrimination. *Dister, 859 F.2d at 1111*. The plaintiff, of course, at all times "retains that ultimate burden of persuading the [trier of fact] that [he] has been the victim of intentional discrimination." *Fisher v. Vassar College, 114 F.3d 1332, 1336 (2d Cir. 1997)* (internal quotations omitted) (regarding plaintiff's Title VII and ADEA claims).

[*36] It is questionable whether plaintiff even established a prima facie case of discriminatory discharge, because plaintiff produced little evidence tending to show that his discharge occurred under circumstances giving rise to an inference that defendant fired him to interfere with his pension rights. Plaintiff claims that he was discharged illegally in August of 1977 because defendant wanted to prevent him from being laid off later that year so that plaintiff would not be eligible to elect the Rule of 65 pension as he would have been had he been laid off. However, at the time plaintiff was fired, defendants did not believe that plaintiff was eligible for the Rule of 65 pension. Bethlehem employees who were union members who were laid off in the fall of 1977 were not eligible for the Rule of 65 pension until after the arbitrator's decision in the spring of 1978 mandated that

defendant offer the pension to those workers. Nonrepresented employees who were laid off in the fall of 1977 were not eligible for the Rule of 65 pension until after both the arbitrators' decision and the decision of defendant to extend the benefit to nonrepresented employees. Since defendant clearly did not intend [*37] to offer the Rule of 65 pension to employees who were laid off in the fall of 1977, plaintiff's argument -- that defendant fired him in August in order to avoid laying him off later, all for the purpose of preventing him from receiving the Rule of 65 pension -- makes little sense.

But even if the Court were to assume, without deciding, that plaintiff did establish a prima facie case, plaintiff failed to show that defendant's proffered justification for firing plaintiff was pretextual. The defendant presented ample evidence to support its claim that plaintiff was fired because he was unable to productively manage his subordinates. The testimony given by Nora May and William Kuebler, in which they described plaintiff's unpleasant demeanor and quick temper, demonstrates that plaintiff was inept at managing his subordinates. The numerous trip reports criticizing plaintiff's performance bolster this conclusion and show that defendant's management had reached the end of its rope with plaintiff. Taken as a whole, defendant's evidence shows that plaintiff was fired because of his well-documented inability to effectively manage his subordinates.

The evidence presented by plaintiff does little [*38] to contradict this conclusion and fails to show the existence of any illegal motive on the part of defendant in discharging plaintiff. Plaintiff seems to rely, at least in part, on the fact that he was discharged before becoming eligible for the Rule of 65 pension, while many others were later laid off and became eligible for the Rule of 65 pension, as evidence of illegality. At trial, in response to the question of why he felt he should have been laid off instead of fired, the plaintiff stated "because there are benefits associated with being laid off, as opposed to being fired." Tr. 636; see also Tr. 638-39. But of course, the mere fact that defendant's discharge adversely affected plaintiff's pension rights is not evidence of an illegal motive. See *Dewitt v. Penn-Del Directory Corp., 106 F.3d 514, 523 (3d Cir. 1997)* ("This kind of deprivation occurs every time an ERISA employer discharges an employee and is not alone probative of an intent to interfere with pension rights.")

1998 U.S. Dist. LEXIS 12176, *38

The testimony given by plaintiff's witnesses is similarly unhelp to plaintiff's claim. These witnesses generally testified that plaintiff treated other employees in a professional manner. As stated above, [*39] the Court generally found the defendant's witnesses, whose testimony cast plaintiff's performance as a manager in a negative light, to be more reliable witnesses than those called on the plaintiff's behalf. The testimony of the plaintiff's witnesses also contradicts the information found in the trip reports, which were critical -- often sharply so -- of plaintiff's managerial style. Since the events at issue took place almost twenty years prior to trial, the Court is inclined to give more weight to the trip reports than to witness testimony, as the reliability of the trip reports is not affected by fading memory, as is the reliability of witness testimony.

Plaintiff also emphasized that Dimmick requested from May a list of employees that contained facts affecting their pension eligibility, such as their dates of birth and years of employment. Plaintiff contends that since his name and information was on the list, Dimmick's request is evidence of his discriminatory intent. The Court finds this argument unavailing. May testified that it was not unusual for Dimmick to request the list. Moreover, the fact that Dimmick requested the list is at best weak circumstantial evidence of illegal [*40] motive and is not particularly compelling.

Plaintiff also pointed out that a few months prior to his discharge, he was given a merit increase in his salary. This salary increase, plaintiff argues, casts suspicion upon defendant's proffered justification for plaintiff's discharge; if plaintiff's managerial performance was as poor as defendant contends, he would not have been given a merit increase. This evidence is not persuasive, as the Court finds credible defendant's explanation of the raise as a means of correcting, at plaintiff's request, a decrease in plaintiff's net income that resulted from plaintiff's higher taxes in New York. Even if the Court accorded no weight to this explanation, the fact that plaintiff received a merit increase does not do much to discredit defendant's justification.

Moreover, plaintiff's case is unavailing because he testified that he thought defendant terminated him to reduce its costs. Tr. 635. But defendant granted 3,404 other Rule of 65 pensions between 1978 and March of 1995. Within this context, it is hard to believe that defendant would take actions to prevent plaintiff from attaining a Rule of 65 Pension. See *Dewitt, 106 F.3d at 523* ("the [*41] record contains no evidence that the savings to the employer resulting from [the plaintiff's] termination were of sufficient size that they may be realistically viewed as a motivating factor.")

As plaintiff has failed to show that defendant's legitimate justification for his discharge was pretextual, or that defendant was motivated by illegal considerations in firing him, plaintiff cannot prevail on his ERISA § 510 claim.

## CONCLUSION

For the reasons stated above, the Court finds in favor of defendant Bethlehem Steel Corporation. The Clerk of Court is hereby ordered to enter judgment in favor of defendant and take all steps necessary to close the case.

IT IS SO ORDERED.

HONORABLE RICHARD J. ARCARA

UNITED STATES DISTRICT COURT

Dated: January 27, 1998

**JUDGMENT IN A CIVIL CASE**

**Decision by Court.** This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED

The plaintiff has failed to show that defendant's legitimate justification for his discharge was pretextual, or that defendant was motivated by illegal considerations in firing him, plaintiff [*42] cannot prevail on his ERISA 510 claim.

The Court finds in favor of the defendant Bethlehem Steel Corporation. A final judgment is entered in favor of defendant and this action is closed.

Date: January 27, 1998